EXHIBIT # 6


Cite as 863 A.2d 631 (R.I. 2005)

STATE

v.

Sythongsay LUANGLATH et al.

No. 94–732–C.A.

Supreme Court of Rhode Island.

Jan. 10, 2005.

**Background:** Defendants were convicted after jury trial in the Superior Court, Providence County, Corinne P. Grande, J., of one count of burglary and three counts of robbery. Defendants appealed following denial of their motion for new trial. The Supreme Court, 749 A.2d 1, remanded. On remand, the Superior Court denied motion for new trial. Defendants appealed.

**Holdings:** The Supreme Court, Williams, C.J., held that:

(1) defendant was not entitled to new trial;

(2) State's failure to disclose evidence did not constitute *Brady* violation;

(3) defendants' waiver of right to have case decided by jury of twelve persons was voluntary and intelligent;

(4) as an issue of first impression, trial justice's failure to inform defense counsel of numerical split that was disclosed in jury's note informing justice that they were deadlocked constituted reversible error; and

(5) supplemental *Allen* instructions given by trial court were unduly coercive.

Convictions vacated; case remanded for new trial.

**1. Criminal Law ⇐1134(4)**

When reviewing a motion for new trial, the Supreme Court will affirm the trial justice's decision unless it is clearly wrong or unless the trial justice, in reviewing the evidence, overlooked or misconceived relevant and material evidence.

**2. Criminal Law ⇐935(1)**

In deciding a motion for a new trial, the trial justice acts as a thirteenth juror and exercises independent judgment on the credibility of witnesses and on the weight of the evidence.

**3. Criminal Law ⇐961**

The record on a decision to grant or refuse a new trial should reflect a few sentences of the trial justice's reasoning on each point, although the trial justice need only cite evidence sufficient for Supreme Court to determine whether the trial justice applied the appropriate standards.

**4. Criminal Law ⇐935(1)**

A motion for new trial should be denied if the trial justice reaches the same determination as did the jury, or if the justice determines that reasonable minds could have differed in reaching the verdict.

**5. Criminal Law ⇐935(1)**

Defendant was not entitled to new trial following convictions for robbery and burglary, even though trial justice had initially questioned whether testimony of victims was reliable due to their discussions about crimes prior to identifying defendant; record indicated that such discussions did not affect their identifications of defendants, as not all victims identified both defendants, those who did expressed no uncertainty, each victim stuck to his or her own memory of the events and was not swayed by the recollection of others, and each victim's version of events differed in some respect from the version given by other victims.

**6. Criminal Law ⇐1134(3)**

Burglary and robbery defendants' claim that trial justice deprived them of due process when she denied their motion for new trial after finding that the evidence presented seriously undercut the reliability of the identifications given by

victims was rendered moot, where trial justice, in her decision on remand, stated that victims were reliable and credible. U.S.C.A. Const.Amend. 14.

**7. Criminal Law ⇐945(2)**

Fact that neighbor who translated for one of victims during her interactions with police came forward believing he could prove innocence of defendants did not constitute newly discovered evidence to entitle robbery and burglary defendants to a new trial; while defendants claimed neighbor's testimony showed that officer who had questioned victim on night offenses occurred had misstated what victim told officer when officer testified at trial, record did not conclusively establish that neighbor was present on night offenses occurred, and statement of neighbor could be used only to question victim's and officer's credibility.

**8. Criminal Law ⇐938(1)**

When a motion for new trial is based on newly discovered evidence, that evidence must satisfy a two-pronged test: evidence must be newly discovered since trial, not discoverable prior to trial with the exercise of due diligence, not merely cumulative or impeaching but rather material to the issue upon which it is admissible, and of type which would probably change the verdict at trial; and hearing justice must determine that evidence is credible enough to warrant a new trial..

**9. Criminal Law ⇐700(3)**

Evidence that detective spoke with the owner of the gas station where victim had told him the third robber worked and was told no one working there resembled the person that victim mistakenly identified as the third offender was not materially exculpatory, and thus State's failure to disclose such evidence did not constitute *Brady* violation in robbery and burglary prosecution; victim's memory was challenged on cross-examination and her testimony was impeached by other prior inconsistent statements in which she told police that the robbers were wearing masks and then later said that she positively could identify them. U.S.C.A. Const.Amend. 14.

**10. Criminal Law ⇐700(2.1)**

If State knows of or has reason to know of materially exculpatory evidence that it intentionally or unintentionally fails to disclose, then a defendant's right to a fair trial has been violated. U.S.C.A. Const.Amend. 14.

**11. Jury ⇐29(6)**

Defendants' waiver of right to have case decided by jury of twelve persons was voluntary and intelligent; after defense counsel informed trial justice of intent of defendants to proceed with eleven jurors, trial justice informed defendants of the rule allowing for a stipulation of less than twelve member jury, trial justice questioned each defendant separately about his educational background and whether he had a "clear head" when making the decision, trial justice asked whether defendants' lawyers had thoroughly explained the options to them and both defendants answered yes, and trial justice asked defendants to sign a waiver to having twelve member jury, which both parties did willingly. Superior Court Rules Crim.Proc., Rule 23(b).

**12. Criminal Law ⇐865(1), 1174(1)**

Trial justice's failure to inform defense counsel of numerical split that was disclosed in jury's note informing justice that they were deadlocked constituted reversible error; note indicated that only one juror was dissenting from the rest, and had counsel been told such information, counsel could have objected to offending portions of supplemental *Allen* instructions that informed jury of great expense of retrial and pressed for mistrial.

**13. Criminal Law ⇐865(1.5)**

Supplemental *Allen* instructions given by trial court after jury gave notice it was deadlocked ten-to-one in favor of guilt, in which court informed jury that case would have to be retried at great expense to State and defendant if a unanimous verdict was not reached, were unduly coercive in burglary and robbery trial.

---

Christopher R. Bush, Providence, for Plaintiff.

John A. MacFadyen, III, Providence, for Defendant.

Present: WILLIAMS, C.J., GOLDBERG, FLAHERTY, and SUTTELL, JJ.

## OPINION

WILLIAMS, Chief Justice.

In 1993 a jury convicted each of the defendants, brothers Sythongsay (Khek) and Soukky (Soukky) Luanglath (collectively defendants), on one count of burglary and three counts of robbery. The defendants then appealed to the Supreme Court arguing, among other things, that the trial justice had improperly denied their motion for a new trial based on the unreliability of the witnesses who testified against them. This Court determined that "[b]ecause the trial justice did not properly exercise her independent judgment in considering the new trial motion, her denial of a new trial [would] not be afforded deference." *State v. Luanglath*, 749 A.2d 1, 5 (R.I.2000) (*Luanglath I*). The case was remanded with instructions to the trial justice to "determine to what extent reliability affects the witnesses' credibility and what weight should be given to their testimony." *Id.* at 6.

Because the trial justice's first decision denying defendants' motion for new trial, viewed in its entirety, led us to conclude that the trial justice's decision on remand could be dispositive, we declined to reach the remaining issues raised by defendants. In 2001, the trial justice issued a written decision in which she left no doubt that she considered the witnesses against defendants to be reliable and that the jury verdict was well-supported by the evidence, thereby necessitating this Court to consider two equally troubling arguments that we did not address in *Luanglath I*.

The defendants came before this Court again on November 9, 2004, to reargue their position that the trial justice improperly denied their motion for new trial based on the weight of the evidence. After careful review of the record in this case, we are of the opinion that the trial justice adequately exercised her independent judgment and we affirm the denial of defendants' motion for new trial on the grounds that the verdict was not against the weight of the evidence. In addition, we reach the two other issues defendants raised on appeal that were not addressed in *Luanglath I*.

In the first issue, we conclude defendants' rights were not violated when the trial went forward with eleven jurors. As to the second issue, and upon careful consideration, we hold that the trial justice erred in denying defendants' motion to pass the case because the trial justice failed to inform counsel of the numerical split of the deadlocked jury that had been disclosed to her in a note. Furthermore, when the supplemental charge, made pursuant to *Allen v. United States*, 164 U.S. 492, 17 S.Ct. 154, 41 L.Ed. 528 (1896), to the deadlocked jury is considered in light

of the trial justice's failure to reveal the split, it is evident that the charge was improper. We, therefore, must reverse the trial justice's decision and order a new trial.

## I

### Facts and Travel

The facts of this case were discussed at length in *Luanglath I*, but we will briefly recite the more pertinent information.

On March 16, 1990, sometime after 11 p.m., three men entered the home of the Souvannaleuth family in Providence, Rhode Island, and robbed them at gunpoint. Present at the time were the parents, Kongkeo (Mrs. Souvannaleuth) and Khamdeng (Mr. Souvannaleuth), their three daughters, Malaythong, Southavong, and Kongseng, and one son, Somsamay.[1] The robbers made off with U.S. currency, gold, and jewelry estimated to value between $39,000 and $78,000.

The family members met with the police shortly after the robbery. None of the family members identified the perpetrators that evening, but Kongseng told police that she recognized two of the men, by their eyes and their voices, as people she knew in the Laotian community. That night the family members stayed up discussing who they thought may have committed the crime, and defendants' names surfaced.

In the days after the robbery, different family members believed they saw their assailants throughout the community. Notably, Kongseng, Malaythong, and Southavong all attended a party in Foxboro, Massachusetts, where defendants' band was performing. With her suspicions confirmed that Soukky and Khek were, in fact, the men who robbed them, Kongseng returned to the police station with a poster advertising the band's performance and positively identified defendants from the picture of the band on the poster.

A jury trial was held in April and May 1993. Once the jury retired for deliberations, chaos ensued. One of the twelve jurors refused to participate in the voting based on his religious beliefs, asserting that he was only there for "assistance." After considering their options, defendants agreed to waive the twelve-person jury and allowed the remaining eleven jurors to proceed.

After a few more hours of deliberations, the jurors notified the trial justice that they were deadlocked. The jurors' note stated: "At the moment it is 10 to 1 and it seems that neither are willing to change their opinion. Can you provide any insight as to how to deal with the decision[?]" The trial justice then met with counsel from both parties in her chambers to go over the supplemental jury instructions that she planned to issue; however, she did not disclose how the jury was divided. The jury was then instructed with basically the same instructions discussed in chambers.

"I'm somewhat surprised that with the jury deliberating such a short time, there is an apparent deadlock. * * * You know, of course, that jurors have a duty, really, to consult with one another and to deliberate and to discuss with a view to reaching an agreement, if it can be done without violence to your individual judgment. Naturally, each of you must decide this case for yourselves, but you do that only after you have impartially considered the evidence in a discussion with all of the other jurors. Although the verdict, as I said, must be the verdict of each individual juror and not just acquiescence in the conclusion of others, the issues submitted to you in this case should be examined with proper regard and deference to the opinions of others. Jurors should not be obstinate for the sake of being obstinate. And a juror should consider it desirable that this case be decided. *If there is no decision by this jury, this case will be tried all over again.* It seems to me that no other jury is going to be more qualified than you are. It isn't that on the next go-round better jurors are going to sit.

"You are qualified. * * * And I should tell you that there's no reason for any juror to think that if this case is retried, more evidence or clearer evidence is going to be presented. *And, if it has to be retried, it will be retried at great expense to the state and great expense to the defendants.*

"As I've told you, it is your duty to decide the case if you can conscientiously do so. And as I said before, don't hesitate to re-examine your views and change your position if you are convinced it is erroneous. I will remind you, of course, that you should never surrender an honestly arrived at conviction as to the weight or effect of the evidence only because of the opinion of other jurors, or only for the sake of returning a verdict. I don't want that to happen either. It appears to me that more time ought to be spent upstairs by this jury. And in about an hour or so I will send a note asking if there has been any progress." (Emphasis added.)

Neither party objected to these instructions but defendants moved to pass the case because of the deadlock. After another hour of deliberations, the jury rendered a unanimous guilty verdict against both defendants for all of the counts against them.

After the jury was dismissed, the trial justice spoke with the state and defense counsel in chambers. She questioned her decision not to reveal the numerical split of the deadlocked jury earlier, opining that the information "may have affected your strategy" and conceded that defendants may have pressed harder for a mistrial had she disclosed the entire contents of the jurors' note.

Thereafter, defendants filed a motion for new trial. At a post-trial hearing, defendants first argued their motion to pass the case based on the trial justice's instructions to the deadlocked jury. In addition, defendants argued that a new trial should be granted because the verdict was against the weight of the evidence.

The trial justice denied defendants' motion for new trial based on the weight of the eyewitness identification evidence, albeit with hesitation. The trial justice determined that the Souvannaleuths were not sophisticated enough to concoct a story to frame defendants and that they appeared to tell the truth. Nevertheless, the trial justice was troubled by inconsistencies in testimony given by the Souvannaleuth family members at a pretrial suppression hearing and their testimony at trial. According to the trial justice, there was a risk of suggestive identification based on the family's inability to identify defendants before they discussed the crime with one another. She also worried that the trip to Foxboro may have served to reinforce the rehabilitated memories of the family members. Notwithstanding these apprehensions, the trial justice determined that it was not her place to rule on the reliability of the witnesses' testimony and that reasonable minds could differ on the outcome of the trial. Accordingly,

1. Because the family members share a surname, we refer to the parents as Mr. and Mrs. Souvannaleuth and the children by their given names. We intend no disrespect to the victims.

she denied defendants' motion. In addition, the trial justice denied "without comment" defendants' motion to pass the case based on the deadlocked jury.

More than two years after the first post-trial hearing, defendants went before the trial justice on another motion for new trial, this time based on newly discovered evidence.[2] That motion was denied because the trial justice found the evidence presented at the hearing would not have altered the jury's verdict. The defendants appealed to this Court.

In *Luanglath I*, this Court considered defendants' appeal from the trial justice's denial of their motion for new trial on the grounds that the verdict was against the weight of the evidence. We concluded in the first appeal that the trial justice should have considered the reliability of the testimony tending to prove defendants' guilt, and, as noted, we remanded this case to the Superior Court without addressing the remaining issues that defendants raised. *Luanglath I*, 749 A.2d at 6.

On remand, the trial justice again heard arguments and read memoranda to support defendants' motion for new trial. In a written decision issued on December 5, 2001, the trial justice made it clear that despite the years that had passed since trial, her "memory of the appearance and demeanor of the witnesses remain[ed] as fresh * * * as at the time of trial." The trial justice denied defendants' second motion for a new trial, concluding:

> "The inescapable conclusion must be, and this Court so finds, that whether or not this Court, at the original motion for a new trial may have mischaracterized the witnesses who testified at the suppression hearing, the fundamental fact remains that the jury verdicts in this trial were correctly and overwhelmingly supported by reliable, probative, competent and credible evidence which convinced this jury that, beyond a reasonable doubt, these defendants were two of the three men who subjected the Souvannaleuth family to an extraordinary night of terror."

The defendants again appeal the trial justice's denial of their motion for new trial based on the weight of the evidence. They also argue that the trial justice violated their constitutional rights in allowing the jury to proceed with eleven members and that the charge to the deadlocked jury was erroneous.

## II

## Motion for New Trial

To support their appeal from the trial justice's denial of their motions for new trial, defendants raise several arguments that we will address *seriatim*.

[1–4] When reviewing a motion for new trial, this Court will affirm the trial justice's decision "unless it is 'clearly wrong or unless the trial justice, in reviewing the evidence, overlooked or misconceived relevant and material evidence.'" *State v. Grayhurst*, 852 A.2d 491, 520 (R.I. 2004) (quoting *State v. Dyer*, 813 A.2d 71, 75 (R.I.2003)). "In deciding a motion for a new trial, the trial justice acts as a thirteenth juror and exercises independent judgment on the credibility of witnesses and on the weight of the evidence." *Id.* (quoting *State v. Nunes*, 788 A.2d 460, 464 (R.I.2002)). The record from the Superior Court "should reflect a few sentences of the trial justice's reasoning on each point, although the trial justice need only cite evidence sufficient for this Court to determine whether the trial justice applied the appropriate standards." *Id.* (quoting *Nunes*, 788 A.2d at 465). A motion for new trial should be denied if "the trial justice reaches the same determination as did the jury, or if the justice determines that reasonable minds could have differed in reaching the verdict * * *." *Id.* (quoting *Dyer*, 813 A.2d at 75).

2. At the hearing, a Laotian neighbor of the Souvannaleuths testified that he had interpreted for the family on the night of the crime but had not come forward until he read about the trial in the newspaper. The defendants said his testimony would discredit Kongseng. In addition, a police officer who had testified at trial testified again at the hearing that when Kongseng misidentified a third suspect, he had been the only one working at the gas station that matched Kongseng's description. According to defendants, this fact was not shared with them before the trial but established that the misidentification arose from her poor memory of her attackers and not because she was too afraid to look directly at the man she was accusing.



### A

### Weight of the Evidence

[5] The defendants argue first that the jury verdict was against the weight of the evidence, placing great emphasis on the trial justice's comments in her original denial of their motion for new trial. According to defendants, the trial justice "overlooked or misconceived material evidence or was otherwise clearly wrong." *State v. Vorgvongsa*, 670 A.2d 1250, 1252 (R.I. 1996). The defendants point to numerous inconsistencies between the trial justice's impressions of the testimony and evidence during the first new trial hearing (first decision) and the later decision issued on remand (remand decision). According to defendants, in her first decision the trial justice questioned whether the witnesses were reliable based on their demeanor at trial, as well as the events that occurred between the robbery and the trial, and then did an about-face upon reconsideration when the case was remanded.

To the contrary, we are satisfied that the trial justice proceeded exactly as requested when this case was sent back to her to make findings about the reliability of the witnesses on the crucial issue of eyewitness identification. She performed an in-depth review of all the testimony and evidence presented at trial; we are remiss to question those findings now. The trial justice's hesitancy in the first decision was not fatal and, on remand, she clarified her apprehensions—she did not contradict her earlier decision as defendants would have us hold. She presented ample evidence to support her reasoning and demonstrated that she had properly applied the appropriate standards for a motion for new trial decision. *Grayhurst*, 852 A.2d at 520.

Although the family's discussion about the crime prior to identifying defendants was troubling, the trial justice presented reasonable justification about why the discussions did not affect the identifications. She noted in her remand decision that

> "[t]here was free admission at the trial that the family discussed the robbery among themselves * * *. Importantly, against this background of full discussion among the victims of the home invasion, the net testimony at all stages of this case was always consistent: Kongseng and her mother identified both brothers, these defendants; Malaythong and her father each identified only that person whose face each had independently seen during the robbery, and the son, Somsamay Souvannaleuth did not identify anyone * * *."

The trial justice further noted that "[e]very witness remained steadfast, unhesitant and certain of his or her individualized identifications of the defendants." According to the trial justice, the fact that not all witnesses identified both defendants, despite having admitted to discussing the identity of their assailants, again demon-

strated reliability. We agree. The fact that each witness stuck to his or her own memory of the events, and was not swayed by the recollection of others, strengthens their testimony.

Furthermore, not only were the events recounted by individual witnesses substantially unchanged throughout the trial, but also each family member's version differed in some respect from the other family members' accounts. Had the family members colluded to formulate one story, they would have recited the same set of facts. The jury heard inconsistent testimony from each of the family members who testified, yet found the important, underlying facts to be consistent. In addition, the trial justice, in her capacity as a "superjuror," found that "nothing in their demeanor on the stand, nor in the content of their testimony, was there the faintest suggestion that their testimony had been orchestrated." Upon review, we concur with the trial justice's finding that the minor inconsistencies increased the reliability of the witnesses' testimony. This was persuasive to the trial justice.

It is also compelling that the jury was well aware that the family members had discussed the identities of the assailants before giving the police Soukky's and Khek's names. Whether the witnesses' memories had been improperly influenced or rehabilitated was an issue properly discussed on cross-examination and during closing statements. The jury was aware of the nighttime discussion and the trip to Foxboro; still, the jury, nonetheless, believed the testimony presented to be credible and reliable. We see no reason to disturb the verdicts on these grounds.

On appeal, defendants present many details about the crime that they claim tend to prove they did not commit it, as well as several studies they allege prove that the Souvanneleuths' identifications were the result of post-event suggestions and untrustworthy methods of identification. Although they raise interesting arguments, we need not address them. First, we note that rarely is a criminal case presented in which every single detail points toward the defendant; accordingly, the fact-finder is asked to determine guilt beyond a reasonable doubt and not beyond all doubt. In addition, although we recognize that there are inherent problems with identifications that are made after the victims have spoken to one another and after they have seen their assailants in the community, the jury and the trial justice believed the witnesses' identifications after hearing all the testimony and evidence. Nothing before us indicates that these findings were wrong.

The trial justice's decision, on remand, makes it clear that she considered the evidence both in defendants' favor and against them when considering their motion for new trial and she applied the appropriate standards in reviewing defendants' motion. We affirm the trial justice's decision and conclude that she neither overlooked nor misconceived material evidence nor was her decision otherwise wrong.

## B

### Due Process

[6] The defendants next argue that the trial justice deprived them of due process when she denied their motion for new trial after finding that the evidence presented seriously undercut the reliability of the eyewitness identifications. According to defendants, once she made findings that called the witnesses' reliability into question, the trial justice was required to grant a new trial. We need not reach the merits of this argument. In *Luanglath I*, 749 A.2d at 4, we concluded what the defendants now argue: that the trial justice was concerned with the reliability of the testimony presented at trial. As discussed above, it was unclear what conclusion the trial justice reached concerning reliability because she improperly determined that it was not her responsibility to rule on that issue. *Id.* at 5.

We remanded the decision so the trial justice could make conclusive findings about the reliability of the witnesses' testimony and clarify her decision denying defendants' motion. *Id.* at 6. If the trial justice had concluded on remand that the witnesses' testimony was unreliable then, as defendants now argue, a new trial would be required. However, this point is now moot because the trial justice, in her remand decision, stated that the witnesses were reliable and credible. Based on the facts before us, there was no previous finding that the eyewitnesses were unreliable, and although we order a new trial on other grounds, there is no reason to grant a new trial on due process grounds. To hold otherwise would require us to overrule *Luanglath I* and hold that the trial justice's comments in the first decision made it necessary to grant a new trial. This we refuse to do.

## C

### Newly Discovered Evidence

[7] The defendants next assert that the trial justice erred in denying their motion for a new trial based on newly discovered evidence. First, defendants identify Khamfay Khamsyvoravong (Khamsyvoravong) as a Laotian neighbor who arrived at the scene of the robbery and translated for Kongseng during her interactions with the police. After the trial ended, Khamsyvoravong came forward believing he could help prove defendants' innocence.

[8] " 'When a motion for new trial is based on newly discovered evidence, that evidence must satisfy a two-pronged test.' " *State v. Firth*, 708 A.2d 526, 532 (R.I.1998). The first prong requires that " 'the evidence be (1) newly discovered since trial, (2) not discoverable prior to trial with the exercise of due diligence, (3) not merely cumulative or impeaching but rather material to the issue upon which it is admissible, [and] (4) of the type which would probably change the verdict at trial.' " *Id.* Once the first prong is satisfied, the trial justice must determine whether the evidence is " 'credible enough to warrant a new trial.' " *Id.*

The defendants argue Khamsyvoravong's testimony proves that on the night of the crime, Mrs. Souvannaleuth told Kongseng to tell the police everything she knew; that Kongseng said that all the robbers were wearing masks; and that the officer who had questioned her had misstated what she told him when he testified at trial. We note first that the trial justice was not "convinced" Khamsyvoravong was even present on the night of the crimes. Therefore, even if we reached the second prong of the newly discovered evidence test, whether the evidence was " 'credible enough to warrant a new trial,' " it expressly was not met. The evidence could be used only to question Kongseng's and Officer Antonio Angelino's credibility. Furthermore, there is no indication that the jury's verdict would have changed even if Khamsyvoravong had testified. Therefore, the evidence does not amount to newly discovered evidence requiring a new trial.

[9, 10] The defendants also argue that the state violated the rule set forth in *Brady v. Maryland*, 373 U.S. 83, 87, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963). The *Brady* rule provides that if the state knows of or has reason to know of materi-

ally exculpatory evidence that it intentionally or unintentionally fails to disclose, then a defendant's right to a fair trial has been violated. *Id.* at 87, 83 S.Ct. 1194. According to defendants, the state failed to report that Det. Stephen James Springer (Det. Springer) later spoke with the owner of the gas station where Kongseng had told him the third robber worked and was told no one working there resembled the person that Kongseng mistakenly identified as the third offender. The defendants argue that Det. Springer's subsequent investigation is material because it would call into question Kongseng's memory and her ability to identify the men who robbed her family.

We note, as the trial justice did in her decision denying defendants' motion, that defendants had ample opportunity at the pretrial hearing to question Det. Springer and further explore the nature of Kongseng's misidentification of the third robber. There is no question that the state had disclosed Kongseng's misidentification. The only information defendants now claim was missing was Det. Springer's subsequent conversation with the owner of the gas station. Kongseng's memory was challenged on cross-examination and her testimony was impeached by other prior inconsistent statements in which she told police that the robbers were wearing masks and then later said that she positively could identify them. Thus, Det. Springer's later investigation does not pass the *Brady* test because the evidence was not materially exculpatory. We conclude that the trial justice properly denied defendants' motions for new trial based on newly discovered evidence and turn next to their argument that their constitutional right to a jury of twelve was violated.

## III

### Waiver of Twelve Jurors

[11] While the jury was deliberating, a strange thing occurred. A juror who implicitly had stated before trial that he was able to make an impartial decision, determined as deliberations got underway that his religion actually prevented him from voting with the jury and that he was there only for "assistance." Left with few options, the trial justice met with the parties to discuss what to do next. She asked the parties whether they had any ideas but none was offered. The trial justice noted that she could call the dissident juror in and "read him the riot act;" she could perhaps substitute the alternate juror; or they could proceed with eleven jurors. After conferring with defendants, defense counsel and the state agreed to proceed with eleven jurors.

Thereafter, the trial justice asked whether defendants needed an interpreter;[3] both responded that they understood English. The trial justice then set forth four options available to defendants: the three mentioned earlier, as well as declaring a mistrial. In the presence of their attorneys, both defendants told the trial justice that they wished to proceed with eleven jurors. The defendants now argue that the trial justice insufficiently explained all the options available to defendants, thus failing to obtain a knowing, intelligent and voluntary waiver of their right to a jury of twelve required by Rule 23 of the Superior Court Rules of Criminal Procedure.

Rule 23(b) states: "Juries shall be of twelve (12) but at any time before verdict the parties may in open court stipulate in writing with the approval of the court that the jury shall consist of any number less than twelve (12)." We have upheld a defendant's voluntary and intentional waiver of his known right to a jury of twelve even when the defendant was not instructed on the possibility of a mistrial. *State v. Pailon,* 590 A.2d 858, 864 (R.I.1991). Our holding in *Pailon* turned on the relatively small likelihood that a mistrial would have been declared or the juror dismissed even if the defendant had challenged the juror during *voir dire. Id.* Our decision in *Pailon* is relevant in holding that a knowing, intelligent and voluntary waiver can be made even when the trial justice does not thoroughly explain every single potential option available. We hold now that in this case there were knowing, intelligent and voluntary waivers from both defendants and, thus, defendants' rights were not violated.

The trial justice was very thorough in ascertaining whether defendants' waiver was knowing and voluntary. After defense counsel informed the trial justice of their clients' intent to proceed with eleven jurors, the trial justice carefully questioned defendants to ascertain whether they actually understood what had been decided. She read Rule 23(b) aloud to defendants to make sure they understood their rights and then questioned each defendant separately about his educational background, how long he had lived in the United States, and whether he had a "clear head" when making the decision. She also asked whether defendants' lawyers had thoroughly explained the options to them, and both defendants answered yes.[4] She also asked defendants to sign a waiver, pursuant to Rule 23(b), which both parties did willingly. She concluded that she was "satisfied that the parties are voluntarily agreeing to proceed with 11 jurors, and I think they understand the consequence of that, and I think they have a clear mind and they understood what I said to them and what the attorneys said." The trial justice clearly and substantially did all that was required of her before determining that defendants understood the nature of their rights and what they were waiving by proceeding with a jury of eleven.

Therefore, we affirm the trial justice's ruling that defendants' constitutional rights were not violated when they agreed to proceed with eleven jurors.

## IV

### Charging a Deadlocked Jury

The defendants argue that the supplemental *Allen*[5] instructions (supplemental instructions) given to the deadlocked jury were improper for three reasons: (1) the trial justice put too much emphasis on the possibility and cost of a retrial; (2) the nature of the instructions was too coercive

3. An interpreter was present during the entire trial.

4. The defendants place great weight on their inability to speak English, alleging that they were unable to understand that mistrial was an option because it is not an everyday word in English. They argue that rather than mentioning that declaring mistrial was an option just before asking defendants how they would like to proceed, the trial justice should have explained that option in terms they could understand. We refuse to place such a responsibility on the trial justice, who was very careful not to proceed without a translator until she got confirmation from defense counsel and defendants themselves that they were able to proceed in English. The defendants were represented by counsel who understood the term "mistrial," yet no request was made at the time seeking clarification for defendants. The trial justice herself was satisfied that defendants were well aware that they were waiving their right to a twelve-member jury and we see no indication otherwise.

5. In *Allen v. United States,* 164 U.S. 492, 501, 17 S.Ct. 154, 41 L.Ed. 528 (1896), the United States Supreme Court upheld jury instructions delivered to a deadlocked jury even though the instructions urged the jurors in the minority to think about the majority's views.

given the fact that only one juror was dissenting from the majority; (3) the trial just should have revealed the numerical split.

In reviewing challenges to an *Allen* charge, this Court applies a totality-of-the-circumstances test. *State v. Rodriguez,* 822 A.2d 894, 900 (R.I.2003). In *State v. Patriarca,* 112 R.I. 14, 53, 308 A.2d 300, 322 (1973), we looked to the *A.B.A. Project on Minimum Standards for Criminal Justice, Trial by Jury,* § 5.4(a) and (b) (approved draft 1968), for guidance in analyzing *Allen* and in instructing a deadlocked jury.

> "That section provides that before deliberation the court may instruct the jury: (1) that in order to return a verdict, each juror must agree thereto; (2) that jurors have a duty to consult with one another and to deliberate with a view to reaching an agreement, if it can be done without violence to individual judgment; (3) that each juror must decide the case for himself, but only after an impartial consideration of the evidence with his fellow jurors; (4) that in the course of deliberations, a juror should not hesitate to reexamine his own views and change his opinion if convinced it is erroneous; and (5) that no juror should surrender his honest conviction as to the weight or effect of the evidence solely because of the opinion of his fellow jurors, or for the mere purpose of returning a verdict." *Patriarca,* 112 R.I. at 53, 308 A.2d at 322.

When the jurors sent a note informing the trial justice that they were deadlocked ten to one and inquiring what they should do, the trial justice issued straightforward instructions that covered, in almost the same words, the scope of the instructions suggested by *Patriarca.* In addition, she added:

> "It seems to me that no other jury is going to be more qualified than you are. It isn't that on the next go-round better jurors are going to sit. You are qualified. * * * And, *if it has to be retried, it will be retried at great expense to the state and great expense to the defendants.* As I've told you, it is your duty to decide the case if you can conscientiously do so." (Emphasis added.)

Neither party specifically objected to these instructions but defendants moved to pass the case immediately after the trial justice issued the supplemental instructions. Shortly after the jury rendered unanimous guilty verdicts, the trial justice herself impeached her decision not to read the entire note to the parties and questioned her instructions as a result. After informing counsel of the ten-to-one deadlock,[6] the trial justice advised that:

> "I thought it best not to talk numbers to you when I told you about this note and told you that I wanted to re-instruct the jury. It may very well have been I should have. I don't know how you would have read it. Either side. It may have affected your strategy, and I will not ask you to discuss it with me, but just to think about it. You may have had stronger objections to the so-called *Allen* charge which I gave. If you knew about the ten to one breakout, you may have indeed pressed for a mistrial, or at least a decision from me, and I didn't give you a decision on the motion for mistrial. And I may very well have been in error in not deciding. But in any event, I thought you should know."

At the first post-trial hearing, defendants strongly argued that the supplemental instructions were improper in light of the fact that one holdout was dissenting from the rest of the jurors at the time the supplemental instructions were issued. We will not hold against defendants their failure to object to the supplemental instructions at the time they were issued—after the trial justice expressly stated that she would not reveal the numerical split. We are satisfied that as soon as defendants had knowledge of the split, they asserted their objections just as the trial justice had speculated they would. Because a *de facto* objection was made as soon as defendants became aware of the circumstances surrounding the instructions, and counsel already had moved to pass the case at the time the supplemental instructions were issued, we will now consider defendants' arguments concerning the supplemental instructions.

[12] First, we hold that the trial justice committed reversible error by informing counsel that she was not willing to reveal the numerical split that was disclosed in the jury's note. Although this issue is before us for the first time, we have held that a trial justice erred when he responded to a jury's note outside the presence of the criminal defendant's counsel because defense counsel had a right to be heard "before a response was given to the note." *State v. Sciarra,* 448 A.2d 1215, 1220 (R.I. 1982). To ensure that defense counsel has sufficient opportunity to be heard before a response is given to the jury's note, it is imperative that the entire contents of the note be revealed. The facts below demonstrate the problems that can occur when counsel is not privy to all the information available to the trial justice. As the trial justice acknowledged, had defense counsel been aware that only one juror was dissenting from the rest, defendants would have objected to the offending portions of the supplemental instructions and "pressed for a mistrial." This did not occur, however, and for the reasons stated herein defendants' motion to pass this case should have been granted.

[13] The defendants argue that the supplemental instructions were needlessly coercive in suggesting that a retrial was both imminent and a waste of time and money, and that the jury should work towards a unanimous verdict. In *Rodriguez,* 822 A.2d at 899, 903, the jurors notified the trial justice that they were split eleven to one in favor of convicting the defendant and were not sure how to proceed.[7] After the trial justice issued supplemental instructions, the jury returned a guilty verdict and the defendant appealed claiming, among other things, that the instructions to the deadlocked jury were coercive in light of the split revealed to the trial justice. *Id.* at 901–03. After reviewing the totality of the circumstances, we concluded that the instructions were not coercive because the numerical split revealed by the jury was unsolicited; the instructions were not addressed to either the majority or minority; it still took the jury an hour after the instructions were issued to reach a verdict; the jury specifically had asked for the trial justice's advice; and the trial justice did not tell the jurors that the case would have to be retried if they failed to reach a unanimous conclusion. *Id.* at 902–04.

Here, the trial justice informed the jury that the case would have to be retried at great expense to the state and defendants if a unanimous verdict was not reached. Although retrial was a likely consequence, the trial justice should not have com-

6. The note read: "At the moment it is ten to one, and it seems that neither are willing to change their opinion. Can you provide any insight as to how to deal with the decision."

7. In the case before us the trial justice was not informed that the majority was voting to convict.

mented on the inconvenience or cost of such an outcome, particularly when, as she noted, the jury had not been in deliberations for that long and all but one juror agreed on a verdict. It is inescapable that the only holdout juror knew that the trial justice was aware of the numerical split, and that the remaining ten jurors knew of the split and knew that the trial justice was aware of the split. Standing alone, this information is enough to require a judge to notify counsel how the jury was divided. In addition, even if the trial justice did not specifically single out the only dissenter, her instructions, coupled with the knowledge of the single holdout, took on a new meaning. When all the factors surrounding the supplemental instructions are considered together, we hold that the trial justice impermissibly exceeded the boundaries set in *Patriarca*. The defendants' motion to pass the case should have been granted.

Because we find that the trial justice erred by failing to reveal the contents of the note in its entirety and by instructing the jury that retrial was both imminent and costly, we reverse her decision denying defendants' motion to pass the case.

## Conclusion

For the reasons stated herein, we vacate the convictions against the defendants and remand to the Superior Court for a new trial. The record shall be remanded to the Superior Court.

Justice ROBINSON did not participate.